OPINION *Page 2 
{¶ 1} Defendant-appellant, Anthony S. Fisher (hereinafter "Fisher"), appeals the Auglaize County Court of Common Pleas jury verdict finding him guilty of fifth degree felony theft. For reasons that follow, we affirm.
 {¶ 2} Fisher served as secretary of the Wapakoneta Men's Bowling Association and secretary/treasurer of two local men's bowling leagues, the Wednesday evening Ron Schweitzer Men's Classic Bowling League and the Friday evening Dan Kiefer, Jr. Men's Bowling League. In his capacity of secretary/treasurer of these two weekly evening leagues, Fisher was responsible for collecting monies from the bowlers to pay expenses and to deposit into a prize fund that was distributed to bowlers at the end of the season.
 {¶ 3} On Tuesday April 18, 2006, Fisher contacted Dan Oakes, the manger of the Astro Lanes bowling alley in Wapakoneta, Ohio, and informed him that approximately $2,300 of the prize fund monies in his possession were stolen from his home sometime that day. After hearing this news, Oakes called Dennis Borgert, the owner of Astro Lanes, and informed him of the situation.
 {¶ 4} Sometime later that evening, Fisher, Oakes, and Mr. Mrs. Borgert met to discuss the situation. Fisher suggested that the problem be handled without police involvement to spare him and the league embarrassment. Fisher offered to sign a promissory note in favor of Astro Lanes if the bowling alley would cover the loss. He also promised to attempt to get a loan from his employer to cover the loss. The parties *Page 3 
apparently agreed to hold off on calling the police and attempted to resolve the issue in-house.
 {¶ 5} On Wednesday April 19, 2006, Oakes began to calculate how much money was missing and what monies should be in the prize fund. He discovered that the numbers were not adding up, and concluded that Fisher must have been withholding more money than he alleged was stolen. That same day, Oakes contacted Fisher to find out if he had acquired a loan from his employer to cover the allegedly stolen prize money. Fisher said that he was unable to acquire the loan, and he never made out a promissory note for the bowling alley. Oakes also questioned Fisher about the prize monies and why the numbers were not adding up. Fisher then informed Oakes that he was taking a $1.00 secretary fee from each bowler per night.
 {¶ 6} Sometime the same day after finding out that Fisher had been taking a $1.00 fee from each bowler and had failed to file a police report for the alleged robbery, Borgert contacted the Wapakoneta Police Department to conduct a further investigation. Subsequent investigation by the Wapakoneta Police Department revealed that Fisher had, in fact, been taking a $1.00 fee from each bowler per night. Fisher contended that he was authorized to take the fee, but many of the bowlers and other organizational officers denied giving Fisher that authority.
 {¶ 7} On May 23, 2006, Fisher voluntarily came to the Wapakoneta Police Department for an interview conducted by Lt. Truesdale. During the interview, Fisher *Page 4 
maintained that he had approximately $2,300 of league funds in his personal Honda Credit Union checking account early the week of April 18th . He further alleged that he had withdrawn the money from the account on Monday April 18, 2006, and that the money was stolen from his home sometime on Tuesday April 19, 2006. Fisher alleged that he did not call the police to file a report, because he wanted to handle the matter in-house and his insurance would not cover stolen cash over $200. Fisher also claimed that he had the authority to charge a $1.00 fee from each bowler per night.
 {¶ 8} Upon subsequent investigation, Lt. Truesdale discovered that Fisher had not made deposits or withdrawals from his Honda Credit Union checking account in the amounts he alleged. At that point, a report was sent to the Auglaize County Prosecuting Attorney for consideration of charges.
 {¶ 9} On October 19, 2006, the case was presented to the Auglaize County grand jury whereupon a single count indictment was filed charging Fisher with one count of theft in violation of R.C. 2913.02(A)(2), a fifth degree felony.
 {¶ 10} On October 31, 2006, Fisher submitted a written plea of not guilty to the charge. On March 5, 2007, a two-day jury trial commenced. On March 6, 2007, the jury returned a verdict of guilty, and the trial court ordered a pre-sentence investigation be conducted.
 {¶ 11} On April 27, 2007, the trial court sentenced Fisher to ten (10) months imprisonment and ordered he pay $5,670.50 in restitution and a fine of $2,500. The trial *Page 5 
court suspended $2,000 of the fine upon condition that Fisher pay restitution within six months of his release from incarceration. The trial court further imposed three (3) years of post release control.
 {¶ 12} Fisher now appeals his theft conviction asserting two assignments of error.
 ASSIGNMENT OF ERROR NO. I THE TRIAL COURT ERRED IN NOT GRANTING THE DEFENDANT'S MOTION FOR ACQUITTAL, PURSUANT TO CRIMINAL RULE 29, IN THAT THE EVIDENCE OF THE STATE OF OHIO WAS INSUFFICIENT FOR THE MATTER TO HAVE BEEN SUBMITTED TO A JURY.
 {¶ 13} In his first assignment of error, Fisher argues that the trial court erred in denying his Crim.R. 29 motion, because the State failed to show that he was not entitled to charge a $1.00 secretary fee per bowler per night. Fisher also argues that he gave a perfectly logical explanation for why the money was missing — it was stolen. He further argues that the reason he did not file a police report for the stolen money was that the probability of recovering the money was low, his insurance would not cover stolen cash over $200, and he wanted to spare himself and the league the embarrassment. In addition, Fisher maintains that the financial records submitted by the State were faulty and could not be relied upon by the jury to convict him.
 {¶ 14} The State, on the other hand, argues that the evidence was sufficient to convict Fisher of a fifth degree felony theft since the violation only requires theft in excess of $500, and Fisher admitted that, at least, $2,300 was missing. Furthermore, the *Page 6 
State argues that the jury, as trier of fact, could disregard Fisher's self-serving story that the funds were stolen.
 {¶ 15} To determine if the trial court erred in denying a Crim.R. 29 motion, the "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Williams (1996), 74 Ohio St.3d 569, 576,660 N.E.2d 724, citing State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus, following Jackson v. Virginia
(1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. We believe there was sufficient evidence in the record that would allow a rational fact-finder to find Fisher guilty of theft.
 {¶ 16} Fisher was charged with theft in violation of R.C.2913.02(A)(2), which provides:
 (A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
 * * *
 (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
R.C. 2913.02(B)(2) provides that if the value of the property or services stolen is five hundred dollars ($500) or more but less than five thousand dollars ($5,000), then the violation is a fifth degree felony. *Page 7 
 {¶ 17} First, Fisher argues that the State failed to present evidence upon which a rational trier of fact could conclude that the $1.00 secretary fee he charged was beyond the bowling league's express or implied consent. We disagree.
 {¶ 18} The State presented the testimony of several bowling league officers, which denied that Fisher had the authority to charge a $1.00 secretary fee. Dan Oakes, manager of the Astro Lanes bowling alley, former treasurer of the Wapakoneta United States Bowling Congress (USBC) Bowling Association, and a thirty-year bowler, testified that he was surprised to find out that Fisher was charging a $1.00 per bowler per night secretary fee. (Mar. 5-6, 2007 T. at 116-17, 127-28, 132). Oakes testified:
 Q: Is that the first time that you had learned that [Fisher] had been taking a dollar a bowler?
 A: Yeah.
 Q: Were you surprised to find that out?
 A: Absolutely.
 Q: Why?
 A: The norm is it's a cent [$0.01] per bowler for a secretary fee, but normally most of the secretaries take their bowling. If it's twelve dollars ($12.00) a night to bowl, that's what their fee is and it's certainly not a dollar in an eighty (80) league, — eighty (80) bowler member league.
 Q: Why do you say "certainly not"?
 A: It's just,-that's a lot,-their prize funds two dollars ($2.00), half of it was goin' to the secretary, so that's surprising to me.
(Id. at 127-28). Douglas Reinhart, the Auglaize County Engineer, previous president of the Wednesday night bowling league, and a twenty-year bowler, testified that he too would be surprised to hear Fisher was taking a $1.00 secretary fee per bowler. (Id. at 199). Reinhart also testified that his review of the 2006-2007 rules did not provide for a *Page 8 
$1.00 secretary fee. (Id.). In fact, he testified that the rules are set at the beginning of the bowling season, and that he did not recall a $1.00 fee rule being adopted. In addition, he did not believe that such a rule would ever pass since there were eighty (80) bowlers resulting in an $80 per night fee. (Id. at 201).
 {¶ 19} Marvin Shaw, a factory worker, secretary of the 2006-2007 Wednesday night bowling league, former vice president of the Friday night bowling league, and a twenty to twenty-five year bowler, testified that the Friday night league did not pay their secretary a $1.00 fee. (Id. at 212-13). As the current secretary for the Friday and Wednesday night leagues, Shaw testified that he gets to bowl each Friday night free, which was equal to $10.00 per week. (Id. at 214). Concerning whether he knew of any secretary earning a $1.00 fee per bowler, Shaw testified:
 Q: And at [the Wednesday night] league, did they discuss what your
 fees would be for the secretarial/ treasurer role this year?
 A: Yes, we did.
 Q: And was that voted on?
 A: Yes.
 Q: Was that a part of the rules or regulations or was it just discussed?
 A: I believe it was put into the rules.
 Q: Do you know of any group that you're familiar with where the bowler gets a dollars [sic] a night?
 A: No, I'm not.
 Q: I mean, a dollar a bowler a night every week?
 A: No, I'm not.
 Q: How long have you been bowling?
 A: Twenty (20) years or twenty-five (25). A long time.
(Id. at 217-18). *Page 9 
 {¶ 20} Several other Wednesday night league bowlers testified that Fisher was not authorized to charge a $1.00 fee. Delmar Merricle, a worker at Plastipak and a twenty-year bowler, testified that he regularly attends league organizational meetings. (Id. at 222). He testified that he did not recall a vote to authorize a $1.00 secretary fee per bowler per night, and he was surprised to find out that Fisher was charging a dollar. (Id.). James Brannon, a worker at the Lima Bargain Center and a retired Wapakoneta Fire Department employee, testified that he attended the 2005-2006 league organizational meeting and that no discussion about paying Fisher a $1.00 fee occurred. (Id. at 230-31). Jeff Triplett, a National Lime Stone worker and a seven to eight-year bowler, testified that he was present at the 2005-2006 league organizational meeting and that he was not aware that Fisher was charging a $1.00 fee. (Id. at 235). He testified that he thought the secretary bowled free and was given forty-five cents ($0.45) per bowler. (Id. at 236). Brian Vanmeter, a Wednesday night league bowler since 1999, testified that he attended the 2005-2006 league organizational meeting and that a $1.00 secretary's fee was never discussed. (Id. at 239).
 {¶ 21} On the other hand, evidence presented for the defense consisted solely of Fisher's testimony. Fisher admitted to charging the $1.00 secretary fee but testified that he was authorized to charge the fee. Fisher alleged that he amended the league rules in 2004, and the amendment was adopted by the league; however, he later removed the language from the rules. Fisher testified: *Page 10 
 Q: Alright. Now, let's talk about that. What's your position on your right or entitlement during that season to collect that dollar? Why were you entitled to collect the dollar?
 * * *
 A: Okay. What I did at the time then too, I started checking with some of the other secretaries that I knew.
 Q: Where?
 A: That did not bowl at Astro Lanes.
 Q: Oh, okay.
 A: I bowled in Sidney, I bowled in Dayton at the time and I checked with some secretaries there to see what they were getting and they all told me that, —
 * * *
 A: Okay, the four (4) secretaries I checked with, and they varied with number of teams from twelve (12) to twenty-eight (28) and they were all charging a dollar a head.
 Q: So based on that information, what did you do?
 A: I marked it on the league rules for `04 — `05.
 Q: What do you mean, "marked it on the league rules"?
 A: As one of my suggestions or changes to go into the league for the following year.
 Q: You mean on organizational night?
 A: When I, — when we had the organizational meeting.
 Q: Alright. So, what happened when you marked that as a suggestion for the organizational meetings?
 A: Okay. When I got the paperwork back, —
 Q: For your leagues?
 A: —, and nothing was crossed out, as far as for the secretary fee, so I incorporated it into the rules.
 Q: Literally written into the rules?
 A: Yes.
 Q: For what year was that, that you did that?
 A: 2004 — 2005.
 Q: Alright. And so you're, — and then what happens 2005-2006, when they have the organizational meeting?
 A: Okay. They made a number of changes to the league rules that year and I took out a couple of the lines, you know, that I didn't think were pertinent, you know, as far as fees and stuff because we'd always, — the bowling alley was charging eight dollars ($8.00) in the league, sponsor *Page 11 fee had stayed the same for three (3) years and in order to cut down on the paperwork and the size of the league rules, I took some items out and printed it up for `05 — `06.
 Q: Included in the things that you took out for convenience sake was the reference to the?
 A: It was the reference to how much was being charged for the league by the bowling center and also my secretary fee, yes.
 Q: Alright.
 A: That was one of the things.
 Q: But you collected, nonetheless, the dollar a head per night as you did the previous year?
 A: Correct.
(Id. at 325-330).
 {¶ 22} Viewing the evidence presented in a light most favorable to the prosecution, we conclude that a rational trier of fact could find that Fisher exceeded the scope of his authority when he charged a $1.00 per bowler per night fee. Williams, 74 Ohio St.3d at 576, citingJenks, 61 Ohio St.3d 259, paragraph two of the syllabus, followingJackson, 443 U.S. 307. Multiple bowlers, including league officers, testified that Fisher did not have the authority to charge a $1.00 secretary fee. Although Fisher testified that he amended the rules, the jury was certainly entitled, as trier of fact, not to believe Fisher's story of how he amended the rules, and then later removed the language from the rules. State v. Frazier, 115 Ohio St.3d 139, 2007-Ohio-5048,873 N.E.2d 1263, ¶ 106, citing State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. *Page 12 
 {¶ 23} Second, Fisher argues that the trial court erred in failing to grant his Crim.R. 29 motion, because he testified that the money was stolen and his failure to report the crime was reasonable under the circumstances. We disagree.
 {¶ 24} Fisher testified that he did not file a police report for the allegedly stolen bowling money, because he wanted to handle the matter internally to spare himself and the league any embarrassment. (Mar. 5-6, 2007 T. at 356, 360). During the police interview, Fisher also alleged that filing a police report would have been futile since the chance of recovery was small, his insurance would only cover $200 in stolen cash, and he had a $500 deductible. (Id. at 280). Fisher further testified that after the money was stolen he was upset and looking for guidance from other bowlers. (Id. at 358).
 {¶ 25} On the other hand, the State presented evidence that Fisher initially lied about filing a police report. Dan Oakes testified that when he asked Fisher if he filed a police report, Fisher indicated that `it had been taken care of (Id. at 124). Further, the State discredited Fisher's story as to why he failed to make a police report for the allegedly stolen bowling money. The State argued that since Fisher was an insurance agent and instructed his clients to file police reports if they were the victims of theft, his story was not credible. (Id. at 382-83).
 {¶ 26} The State also presented evidence that Fisher had lied during the police interview concerning his deposits into and withdrawals from the Honda Credit Union checking account. During the interview, Fisher indicated that he made regular deposits *Page 13 
of $75-80 into the account; however, Lt. Truesdale testified that the bank records indicated no systematic deposits of money into the account. (Id. at 278-79). Fisher also told police that on Monday April 18, 2006 he withdrew the $2,300 that was stolen from the Honda Credit Union account. Lt. Truesdale testified that the records indicated that no withdrawals at all were made during the entire month of April 2006. (Id. at 278). Lt. Truesdale also testified that Fisher first informed the police of the alleged theft the day of the police interview, almost one month after the fact. (Id. at 280.). Fisher admitted lying to the police and testified that he lied because he was embarrassed and attempting to settle things with the bowling alley. (Id. at 371, 382).
 {¶ 27} In addition, the State discredited Fisher's explanation that he lied to the police to settle things with the bowling alley. Dan Oakes testified that Fisher never appeared to sign a promissory note that he offered to make up for the lost money. (Id. at 131). And, the State presented evidence that Fisher was not truthfully reporting his bowling income for tax purposes. (Id. at 375).
 {¶ 28} Third, Fisher argues that the bowling league records did not establish how much money was missing; and therefore, the jury could not convict him of a theft offense, which required that $500 was stolen. Fisher's argument lacks merit. The jury did not rely solely on the records maintained by Fisher. Rather, Dan Oakes testified that the missing money amounted to $2,800 if Fisher charged $1.00 per bowler or $4,700 if Fisher charged $0.25 per bowler. (Mar. 5-6, 2007 T. at 128, 164, 174). More *Page 14 
importantly, however, Fisher admitted that approximately $2,365 was allegedly stolen from his home. (Id. at 331, 350); (State's Exhibit 5). Consequently, from his own testimony the jury could have rationally concluded that the theft offense was over $500 if the jury concluded that Fisher was not robbed and that he stole the money himself.
 {¶ 29} Viewing the evidence presented in a light most favorable to the prosecution, we conclude that a rational trier of fact could find that Fisher was guilty of theft, his explanation notwithstanding.Williams, 74 Ohio St.3d at 576, citing Jenks, 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson, 443 U.S. 307. Simply put, the jury did not believe Fisher's story that the money had been stolen. Given that Fisher lied several times during the course of the investigation, the jury was reasonable in not believing him.Frazier, 2007-Ohio-5048, at ¶ 106, citing DeHass, 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 30} Fisher's assignment of error one is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. II THE DEFENDANT'S CONVICTION OF FELONY THEFT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 31} Fisher argues that his theft conviction is against the manifest weight of the evidence because: (1) the evidence was conflicting; (2) the State failed to clearly establish the amount of allegedly misappropriated funds; and (3) the State failed to show that Fisher was unauthorized to collect a $1.00 fee per bowler. We disagree. *Page 15 
 {¶ 32} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "`[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses.DeHass, 10 Ohio St.2d at 231.
 {¶ 33} Our review of the record, infra, leads us to conclude that the jury did not clearly lose its way, and that a manifest miscarriage of justice did not occur. Fisher, himself, admitted that, at least, $2,300 was missing from the bowling league funds. (Mar. 5-6, 2007 T. at 331, 350); (State's Exhibit 5). Fisher alleged that the money was stolen from his home. However, Fisher's credibility before the jury was suspect. To begin with, Fisher was an insurance agent. (Id. at 375). A rational juror could conclude that an insurance agent's response to a theft would be to immediately file a police report. Fisher did not. Fisher explained that he did not file a police report because it was useless and would embarrass himself and the league. (Id. at 356, 360). He also testified that he was trying to handle the matter in-house. However, this explanation was discredited by Dan *Page 16 
Oakes who testified that Fisher never came to sign a promissory note, and was avoiding contact with him. (Id. at 131).
 {¶ 34} In addition to this questionable story, Fisher lied several more times. First, he lied to Dan Oakes when he informed him that a police report was filed. (Id. at 124). Second, he lied to the police about the deposits into and withdrawals out of the Honda Credit Union checking account. (Id. at 371, 382). Third, he lied about the extent of the alleged theft at his home — at first, indicating to police that only the cash was stolen; later, indicating that two television sets were stolen as well. (State's Exhibit 5). Fourth, he lied to the government about how much money he was making as secretary/treasurer for tax purposes. (Id. at 375).
 {¶ 35} Given these multiple fabrications, the jury was justified in not finding Fisher's testimony credible. The jury was also justified in finding the State's witnesses' testimony that Fisher did not have the authority to charge a $1.00 fee and that the amount stolen was over $500 credible. Accordingly, we cannot say that the jury clearly lost its way.
 {¶ 36} Fisher's second assignment of error is, therefore, overruled.
 {¶ 37} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed.
 ROGERS, P.J., and WILLAMOWSKI, J., concur. *Page 1